RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0179p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CRAIG WILSON, ERIC BELLAMY, KENDAL NELSON, and
MAXIMINO NIEVES, on behalf of themselves and all
others similarly situated,

>	*Petitioners-Appellees*,

	*v.*

MARK WILLIAMS, in his official capacity as Warden of
Elkton Federal Correctional Institution; MICHAEL
CARVAJAL, in his official capacity as the Federal
Bureau of Prisons Director,

>	*Respondents-Appellants*.

No. 20-3447

---

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:20-cv-00794—James S. Gwin, District Judge.

Argued:  June 5, 2020

Decided and Filed:  June 9, 2020

Before:  COLE, Chief Judge; GIBBONS and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Sarah Carroll, UNITED STATES DEPARTMENT OF JUSTICE, for Appellants.
David J. Carey, ACLU OF OHIO FOUNDATION, Columbus, Ohio, for Appellees.
**ON BRIEF:**   Sarah Carroll, Abby C. Wright, Casen B. Ross, UNITED STATES
DEPARTMENT OF JUSTICE, for Appellants.   David J. Carey, ACLU OF OHIO
FOUNDATION, Columbus, Ohio, Joseph Mead, Freda J. Levenson, ACLU OF OHIO
FOUNDATION, Cleveland, Ohio, David A. Singleton, Mark A. Vander Laan, Michael L.
Zuckerman, OHIO JUSTICE & POLICY CENTER, Cincinnati, Ohio, Kirti Datla, HOGANS
LOVELLS US LLP, Washington, D.C., for Appellees.  Laura Osseck, DISABILITY RIGHTS

OHIO, Columbus, Ohio, Subodh Chandra, THE CHANDRA LAW FIRM LLC, Cleveland, Ohio, for Amici Curiae.

GIBBONS, J., delivered the opinion of the court in which COOK, J., joined, and COLE, C.J., joined in part. COLE, C.J. (pp. 21–28), delivered a separate opinion concurring in part and dissenting in part.

———————————

## OPINION

———————————

JULIA SMITH GIBBONS, Circuit Judge. Petitioners, four inmates housed in the low-security Elkton Federal Correctional Institution and its satellite facility FSL Elkton (collectively "Elkton"), on behalf of themselves and others housed or to be housed there, filed a petition under 28 U.S.C. § 2241 to obtain release from custody to limit their exposure to the COVID-19 virus. They sought to represent all current and future inmates, including a subclass of inmates who—through age and/or certain medical conditions—were particularly vulnerable to complications, including death, if they contracted COVID-19. The district court entered a preliminary injunction on April 22, 2020, directing Respondents Mark Williams, Elkton's warden, and Michael Carvajal, the Director of the Federal Bureau of Prisons ("BOP") (together "BOP"), to (1) evaluate each subclass member's eligibility for transfer out of Elkton by any means, including compassionate release, parole or community supervision, transfer furlough, or non-transfer furlough within two weeks; (2) transfer those deemed ineligible for compassionate release to another BOP facility where testing is available and physical distancing is possible; and (3) not allow those transferred to return to Elkton until certain conditions were met.

On appeal, the BOP argues that (1) the district court lacked jurisdiction under 28 U.S.C. § 2241 and that the suit must comply with the Prison Litigation Reform Act ("PLRA"); (2) petitioners have not shown a likelihood of success on the merits of their Eighth Amendment claim; and (3) the district court abused its discretion in granting the injunction.

We hold that jurisdiction was proper under § 2241, although § 2241 does not permit some of the relief petitioners seek. However, because the district court erred in concluding that petitioners have shown a likelihood of success on the merits of their Eighth Amendment claim,

we conclude that the district court abused its discretion in granting the preliminary injunction. We thus vacate the injunction.

## I.

Petitioners filed a petition under 28 U.S.C. § 2241 seeking release due to the impact of the COVID-19 pandemic at the Elkton facilities. "Our task is . . . to review the record that was before the district court at the time the preliminary injunction was entered." *Johnson v. City of Memphis*, 444 F. App'x 856, 860 n.2 (6th Cir. 2011); *see also Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 673 (2004).

## A.

The COVID-19 virus is highly infectious and can be transmitted easily from person to person. COVID-19 fatality rates increase with age and underlying health conditions such as cardiovascular disease, respiratory disease, diabetes, and immune compromise. If contracted, COVID-19 can cause severe complications or death. Because there is no current vaccine, the Centers for Disease Control and Prevention ("CDC") recommends preventative measures to decrease transmission such as physical distancing, mask wearing, and increasing focus on personal hygiene such as additional hand washing.

## B.

Elkton is a low-security prison in Lisbon, Ohio, designed to house approximately 2,000 inmates at the main facility and 500 inmates at the satellite facility. The main facility consists of three buildings with six dormitory-style housing units; each unit holds approximately 300 inmates split between two sides. The satellite facility has two housing units, each with approximately 250 inmates. Each side of a housing unit contains approximately 150 bunks resulting in two to three inmates sharing a cube and sleeping a few feet away from each other.

In response to the pandemic, the BOP began a phased approach nationwide. Phase One of its action plan began in January 2020 and involved creating a strategic response plan. On March 13, 2020, the BOP implemented Phase Two, which suspended social and legal visits, inmate facility transfers, staff travel and training, contractor access, and volunteer visits.

Elkton began implementing Phase Two health screening of arriving inmates and staff for COVID-19 symptoms and risk factors on March 22. Additionally, the BOP modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures. Phase Three involved inventorying the BOP's cleaning, sanitation, and medical supplies. In Phase Four, beginning on March 26, the BOP expanded its initial screening procedures to mandate use of a screening tool and temperature check, and require asymptomatic arrivals to be placed in quarantine for fourteen days and symptomatic arrivals to be isolated until they tested negative for COVID-19 or were cleared by medical staff.

On March 31, the BOP implemented Phase Five. Phase Five required all inmates to be secured to their quarters for a fourteen-day period with limited access to the commissary, laundry, showers, telephone, and other services. The BOP also coordinated with the U.S. Marshals Service to decrease incoming arrivals during this period. Phase Six, ordered on April 13, extended Phase Five through May 18.

In addition to complying with nationwide directives, Elkton also provided inmate and staff education through Frequently Asked Questions bulletins, provided staff training on using Personal Protective Equipment, ordered enhanced cleaning, and took other preventative measures. Elkton also began, but quickly ended, daily temperature screening of inmates. For inmates deemed to have "essential" work details requiring movement throughout the building, such as food service and cleaning orderlies, Elkton implemented enhanced screening before and after assigned work details. Inmates are encouraged to self-monitor and report symptoms and are screened for symptoms and exposure to risk factors.

Elkton avers that "[a]ll inmates have access to sinks, water, and soap at all times" and "inmates may receive new soap weekly" or "upon request." DE 10-1, Dees Decl., PageID 183–84. And staff have consistent access to soap and hand sanitizer. Elkton provided personal protective equipment to staff to be used in designated locations such as quarantine areas and isolation units. Staff and inmates were provided two surgical face masks for daily use.

Elkton's "[m]edical staff determine if COVID-19 testing is necessary based on applicable guidelines and community standards." *Id.* at 185. Elkton initially received fifty-five testing swabs to test inmates and staff, and as of April 15 had eighteen swabs remaining. In addition, Elkton received an Abbott rapid-testing machine with twenty-five screening test cassettes and hoped to receive twenty-five additional cassettes each week. As of April 22, fifty-nine inmates and forty-six staff members tested positive for COVID-19, and six inmates had died.

Petitioners contend that the BOP's approach and procedures are limited in effectiveness due to the dormitory-style housing at Elkton making it impossible to maintain physical distance and because there are insufficient supplies. Inmates were issued two disposable masks but have no ability to clean them after repeated use. Inmates are also issued a weekly four-ounce bottle of 3-in-1 soap, so inmates frequently run out of soap. There are few shower and bathroom facilities, so inmates are in close proximity to each other when they use those facilities. Additionally, inmates are unable to physically distance when moving within the facility to pick up meals, use phones and computers, or move within the housing unit itself. Moreover, some inmates circulate through the prison as "essential workers" interacting with others outside their housing unit. Several features of the Elkton facilities "heighten risks for exposure, acquisition, transmission, and clinical complications," including: "overcrowding; population density in close confinement; insufficient ventilation; shared toilet, shower, and eating environments; and limits on hygiene and personal protective equipment such as masks and gloves in some facilities." DE 1-4, Goldenson Decl., PageID 61–62; *see also* DE 1-3, Novisky Decl., PageID 50–51.

C.

Petitioners, on behalf of themselves and current and future inmates at Elkton, allege that their confinement in the midst of the COVID-19 outbreak violates the Eighth Amendment. Specifically, petitioners claim that "there is no set of internal protocols or practices that, in light of the current conditions and population levels, Elkton can use that will prevent further disease and death inside the prison." DE 1, Habeas Pet., PageID 2. Therefore, petitioners sought class certification and a preliminary injunction ordering the BOP to identify and release all inmates ages fifty or older and those that are medically vulnerable. Beyond the release of the initial

subclass, petitioners seek specific mitigation efforts to prevent spread of COVID-19 within Elkton.

On April 22, the district court granted petitioners' motion in part. The district court recognized the measures Elkton put in place in response to the COVID-19 pandemic but found that "Elkton officials fight a losing battle. A losing battle for staff. A losing battle for inmates." DE 22, Order, PageID 353–54. Because of the BOP's limited testing capacity and "the prison's 'dorm-style' design," "inmates remain in close proximity" and "COVID-19 is going to continue to spread." *Id.* at 354. Despite screening measures, "once the virus is inside the prison, as it already is at Elkton, screening measures can only be so effective." *Id.* at 356. The district court found Elkton's "modified operations" to be "[b]etter practices, but not enough." *Id.*

On the merits of petitioners' motion for a preliminary injunction, the district court held that "the exceptional circumstances at Elkton and petitioners' substantial claims, that are likely to succeed at the merits stage, necessitate the exercise of [the district court's enlargement] authority and that such a relief is proper for members of the [medically-vulnerable subclass]."[1] *Id.* at 359–60. First, the district court held that it had jurisdiction under § 2241 over petitioners' claims regarding the medically-vulnerable subclass because they sought release and "ultimately [sought] to challenge the fact or duration of confinement as well." *Id.* at 361. However, the district court found that the claims of the other inmates at Elkton were conditions of confinement claims properly brought under 42 U.S.C. § 1983.[2]

The district court conditionally certified a medically-vulnerable subclass and determined that the subclass was likely to succeed on the merits of the Eighth Amendment claim. The district court limited the subclass to inmates sixty-five and older and those with medical conditions posing additional risk of severe harm from COVID-19. Because the subclass consisted of hundreds of inmates who were subject to the same dangerous conditions at Elkton

---

[1]The district court relied on *Dotson v. Clark*, 900 F.2d 77, 79 (6th Cir. 1990) and *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001) for this "enlargement" authority. We are skeptical that either *Mapp* or *Dotson* supports the district court's expansive use of such authority here.

[2]We note that the district court's observation about the availability of a § 1983 claim appears mistaken. Section 1983 provides no cause of action against the federal BOP respondents because they are not acting under color of state law. *Irvin v. United States*, 845 F.2d 126, 127 n.1 (6th Cir. 1988).

and petitioners have serious medical issues commensurate with the rest of the subclass, the court held that petitioners met the requirements of Federal Rule of Civil Procedure 23(b).

Balancing the potential harms and public interest, the district court granted the preliminary injunction and required the BOP to (1) identify all members of the subclass within one day; (2) "evaluate each subclass member's eligibility for transfer out of Elkton through any means, including but not limited to compassionate release, parole or community supervision, transfer furlough, or non-transfer furlough within two [] weeks"; and (3) to not return any subclass member transferred out of the facility to Elkton "until the threat of the virus is abated or until a vaccine is available and Elkton obtains sufficient vaccine supplies to vaccinate its population, whichever occurs first." *Id.* at 370–72.

On April 27, the BOP filed a notice of interlocutory appeal. On April 28, the BOP filed an emergency motion for an administrative stay and stay pending appeal to the district court and this court. Both this panel and the district court denied the motions to stay.

On May 6, petitioners filed an emergency motion to enforce the preliminary injunction. The district court granted the motion to enforce on May 19, concluding that the BOP's actions did not comply with the preliminary injunction.

On May 20, the BOP filed an application for a stay of the district court's April 22 preliminary injunction order and May 19 enforcement order to the Supreme Court. *Williams v. Wilson*, No. 19A1041, Application for Stay (May 20, 2020). The Supreme Court denied the application for a stay in light of the fact that the BOP had not sought review or a stay of the May 19 order in this court. *Williams v. Wilson*, No. 19A1041, Order (May 26, 2020).

On May 27, the BOP filed a notice of appeal from the May 19 enforcement order. On May 29, the BOP requested a stay of the same order. We denied that motion. On June 1, the BOP filed another application for a stay of the May 19 enforcement order to the Supreme Court. *Williams v. Wilson*, No. 19A1047, Application for Stay (June 1, 2020). On June 4, the Supreme Court granted the BOP's request for an administrative stay pending disposition of this appeal and further order of the Court. *Williams v. Wilson*, No. 19A1047, Order (June 4, 2020).

II.

"A district court must balance four factors in determining whether to grant a preliminary injunction: '(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction.'" *Am. Civil Liberties Union Fund of Mich. v. Livingston County*, 796 F.3d 636, 642 (6th Cir. 2015) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). However, "the likelihood of success on the merits often will be the determinative factor." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689 (6th Cir. 2014) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)).

"[T]he party seeking a preliminary injunction bears the burden of justifying such relief." *Livingston County*, 796 F.3d at 642 (quoting *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012)); *see also Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 546 n.2 (6th Cir. 2007) ("[I]n seeking a preliminary injunction, a federal plaintiff has the burden of establishing the likelihood of success on the merits.").

A movant's likelihood of success on the merits is a question of law reviewed de novo, but we review for abuse of discretion the district court's ultimate conclusion as to whether the preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief. *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011). Abuse of discretion "is a highly deferential standard, and the 'district court's determination will be disturbed only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard.'" *Gale v. O'Donohue*, 751 F. App'x 876, 881–82 (6th Cir. 2018) (quoting *Tenke Corp.*, 511 F.3d at 541).

III.

The BOP argues that the district court's decision should be reversed because the district court lacked jurisdiction to consider the petition, incorrectly concluded that petitioners were

likely to succeed on the merits, and abused its discretion in granting the preliminary injunction. We disagree with the BOP's assertion that the district court lacked jurisdiction. To the extent petitioners argue the alleged unconstitutional conditions of their confinement can be remedied only by release, 28 U.S.C. § 2241 conferred upon the district court jurisdiction to consider the petition. We agree with the BOP, however, that the district court erred in concluding that petitioners were likely to succeed on the merits of their Eighth Amendment claim. And, because petitioners are unlikely to succeed on the merits, we must also conclude that the district court abused its discretion by granting petitioners a preliminary injunction.

## A.

We must initially address whether the district court properly invoked jurisdiction under 28 U.S.C. § 2241 over petitioners' claims. We conclude that petitioners' claims are properly brought under § 2241 because they challenge the fact or extent of their confinement by seeking release from custody. However, because petitioners bring their claims under § 2241, the relief available is circumscribed.

Section 2241 provides jurisdiction to district courts over habeas petitions when a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).

Petitioners seek release from Elkton and allege that there are "no mitigation efforts that Elkton could undertake that would prevent the risk of contraction—and possible later spread to the non-prison community—to any acceptable degree, other than immediate release of the Medically-Vulnerable Subclass." DE 1, Habeas Pet., PageID 33. Rather than arguing that there are particular procedures or safeguards that the BOP should put in place to prevent the spread of COVID-19 throughout Elkton, petitioners contend that there are no conditions of confinement sufficient to prevent irreparable constitutional injury at Elkton. They therefore seek release. Our precedent supports the conclusion that where a petitioner claims that no set of conditions would be constitutionally sufficient the claim should be construed as challenging the fact or extent, rather than the conditions, of the confinement. *See Adams v. Bradshaw*, 644 F.3d 481, 483 (6th Cir. 2011); *cf. Terrell v. United States*, 564 F.3d 442, 446−48 (6th Cir. 2009). The Supreme

Court has held that release from confinement—the remedy petitioners seek here—is "the heart of habeas corpus." *Preiser v. Rodriguez*, 411 U.S. 475, 498 (1973).

The BOP's attempts to classify petitioners' claims as "conditions of confinement" claims, subject to the PLRA, are unavailing. The BOP is correct that conditions of confinement claims seeking relief in the form of improvement of prison conditions or transfer to another facility are not properly brought under § 2241. *See Luedtke v. Berkebile*, 704 F.3d 465, 466 (6th Cir. 2013). The BOP relies primarily on *Martin v. Overton*, 391 F.3d 710 (6th Cir. 2004), to argue that petitioners' claims are properly characterized as conditions of confinement claims. In *Martin*, the petitioner sought "transfer to a different prison facility for the purpose of medical treatment and civil damages resulting from the alleged delay and denial of that treatment." 391 F.3d at 714.

Because petitioners outside the medically-vulnerable subclass sought improvement in the conditions at Elkton rather than release, the district court correctly concluded that the claims by these inmates were conditions of confinement claims not appropriately considered under § 2241.

In contrast, petitioners in the medically-vulnerable subclass bring claims that are readily distinguishable from those in *Martin*, because "[p]etitioners challenge the extent of their custody and seek release from their confinement at Elkton" rather than transfer to another facility to receive different medical care. CA6 R. 40, Appellee Br., PageID 33. Petitioners also point out that the petitioner in *Martin* could have any constitutional claims remedied without a change in his custody. Petitioners here, however, contend that the constitutional violations occurring at Elkton as a result of the pandemic can be remedied only by release. The BOP's framing of the requested relief as seeking transfer or improvement to the BOP's COVID-19 response procedures overlooks the fact that petitioners in the subclass seek release. Because petitioners seek release from confinement, "the heart of habeas corpus," *Preiser*, 411 U.S. at 498, jurisdiction is proper under § 2241.

However, the decision to bring a habeas claim, rather than one challenging the conditions of confinement, limits the type of relief available to petitioners. A district court reviewing a

claim under § 2241 does not have authority to circumvent the established procedures governing the various forms of release enacted by Congress.

The district court's preliminary injunction order primarily grants relief consistent with statutory limitations and procedures. The district court ordered the BOP to "evaluate each subclass member's eligibility for transfer out of Elkton through any means, including but not limited to compassionate release, parole or community supervision, transfer furlough, or non-transfer furlough within two (2) weeks." DE 22, Order, PageID 371. The preliminary injunction order requires the BOP to evaluate these forms of release and determine if any of the subclass members are eligible. The district court's order to "prioritize the review [of petitioners] by the medical threat level" is not to the contrary. We decline to set forth a comprehensive list of permissible forms of relief, but we note that the district court's order requiring transfer from Elkton to another BOP facility was not proper under § 2241. *See Martin*, 391 F.3d at 714.[3]

Because petitioners' claims are properly brought under § 2241, the BOP's argument that the claims are foreclosed by the PLRA fails. The PLRA does not apply in habeas proceedings. *See* 18 U.S.C. § 3626(g)(2).

B.

Turning to the preliminary injunction, we focus our analysis on petitioners' likelihood of success on the merits of their Eighth Amendment claim, as this prong of the preliminary injunction framework is often dispositive.

---

[3]We disagree with petitioners' argument that *United States v. Jalili*, 925 F.2d 889 (6th Cir. 1991), supports the conclusion that transfer is an available remedy under § 2241. *Jalili* addressed whether a district court had jurisdiction under 28 U.S.C. § 2255 over a challenge to the BOP's designation of facility. *Id.* at 893. The court concluded that the district court did not have jurisdiction under § 2255 because Jalili was challenging "the manner in which the sentence was being executed, rather than the validity of the sentence itself." *Id.* at 893–94. Jalili was not simply requesting transfer to another BOP facility, he was arguing that he should not be placed in a higher-security facility contrary to the district court's explicit direction that he serve his sentence at a community treatment center. *Id.* at 891. This was properly a challenge to the execution of the district court's sentence and not an invitation for any petitioners seeking transfer to another facility to bring a claim under § 2241.

1.

We turn first to petitioners' likelihood of success on their Eighth Amendment claim. The Eighth Amendment protects all people from "cruel and unusual punishments." U.S. Const. amend. VIII.

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being . . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment . . . .

*Helling v. McKinney*, 509 U.S. 25, 32 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)).

"The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones, and . . . 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (first quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), then quoting *Helling*, 509 U.S. at 31). "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.* at 828.

The Eighth Amendment's deliberate indifference framework includes both an objective and subjective prong. *Id.* at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

The ultimate fact of whether the BOP's conduct could constitute deliberate indifference is a mixed question of law and fact that we review de novo. *See Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc).

Here, the objective prong is easily satisfied. In assessing the objective prong, we ask whether petitioners have provided evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death. The BOP acknowledges that "[t]he health risks posed by COIVD-19 are significant." CA6 R. 35, Appellant Br., PageID 42. The infection and fatality rates at Elkton have borne out the serious risk of COVID-19, despite the BOP's efforts. The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other—and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death. Petitioners have put forth sufficient evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

Turning to the subjective prong, the question is whether petitioners have demonstrated that the BOP's response to the COVID-19 pandemic has been deliberately indifferent to this serious risk of harm. We conclude that petitioners are unlikely to succeed on the merits of their Eighth Amendment claim because, as of April 22, the BOP responded reasonably to the known, serious risks posed by COVID-19 to petitioners at Elkton.

There is no question that the BOP was aware of and understood the potential risk of serious harm to inmates at Elkton through exposure to the COVID-19 virus. As of April 22, fifty-nine inmates and forty-six staff members tested positive for COVID-19, and six inmates had died. "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). The BOP acknowledged the risk from COVID-19 and implemented a six-phase plan to mitigate the risk of COVID-19 spreading at Elkton.

The key inquiry is whether the BOP "responded reasonably to th[is] risk." *Farmer*, 511 U.S. at 844. The BOP contends that it has acted "assiduously to protect inmates from the risks of COVID-19, to the extent possible." CA6 R. 35, Appellant Br., PageID 42. These actions include

> implement[ing] measures to screen inmates for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the virus; limit[ing] inmates' movement from their residential areas and otherwise limit[ing] group gatherings; conduct[ing] testing in accordance with CDC guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening; clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells; provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff and inmates about ways to avoid contracting and transmitting the virus; and provid[ing] masks to inmates and various other personal protective equipment to staff.

*Id.* at 42–43. The BOP argues that these actions show it has responded reasonably to the risk posed by COVID-19 and that the conditions at Elkton cannot be found to violate the Eighth Amendment. We agree.

Here, while the harm imposed by COVID-19 on inmates at Elkton "ultimately [is] not averted," the BOP has "responded reasonably to the risk" and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights. *Farmer*, 511 U.S. at 844. The BOP implemented a six-phase action plan to reduce the risk of COVID-19 spread at Elkton. Before the district court granted the preliminary injunction at issue, the BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, and providing masks. The BOP initally struggled to scale up its testing capacity just before the district court issued the preliminary injunction, but even there the BOP represented that it was on the cusp of expanding testing. The BOP's efforts to expand testing demonstrate the opposite of a disregard of a serious health risk.

This court has found similar responses by prison officials and medical personnel to be reasonable responses to serious risks of harm. In *Wooler v. Hickman County*, this court held that a jail nurse "clean[ing] every cell, quarantin[ing] the infected inmates, and distribut[ing] information about [a bacterial disease]"—"consistent efforts to reduce th[e] risk"—"preclude[d]

a finding of deliberate indifference." 377 F. App'x 502, 506 (6th Cir. 2010); *see also Rouster v. County of Saginaw*, 749 F.3d 437, 448–49 (6th Cir. 2014) (holding that a prison nurse prescribing over-the-counter medication and placing an inmate in an observation cell were "appropriate steps" even if she "could have and should have done more"); *Harrison v. Ash*, 539 F.3d 510, 519–20 (6th Cir. 2008) (holding that the officers "reasonably responded to the substantial risk to [the inmate's] health" when they summoned medical support). "An inmate's 'disagreement with the testing and treatment he has received . . . does not rise to the level of an Eighth Amendment violation.'" *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018) (quoting *Dodson v. Wilkinson*, 304 F. App'x 434, 440 (6th Cir. 2008)).

Our sister circuits have concluded that similar actions by prison officials demonstrate a reasonable response to the risk posed by COVID-19. *See Swain v. Junior*, 958 F.3d 1081 (11th Cir. 2020) (per curiam); *Valentine v. Collier*, 956 F.3d 797 (5th Cir. 2020) (per curiam); *Marlowe v. LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (per curiam).

In *Swain*, the Eleventh Circuit granted a stay of a preliminary injunction pending appeal on state inmates' Eighth Amendment claims. 958 F.3d at 1085. The Eleventh Circuit held that "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence,'" and "the evidence supports that [Metro West Detention Center ("MWDC")] is] taking the risk of COVID-19 seriously." *Id.* at 1088–90 (citation omitted). In response to the pandemic in early March, MWDC began "cancelling inmate visitation; screening arrestees, inmates, and staff; and advising staff of use of protective equipment and sanitation practices" and, after reviewing further CDC guidance, began "daily temperature screenings of all persons entering Metro West, establish[ed] a 'COVID-19 Incident Command Center and Response Line' to track testing and identify close contacts with the virus, develop[ed] a social hygiene campaign, and mandate[d] that staff and inmates wear protective masks at all times." *Id.* at 1085–86. The Eleventh Circuit held that, because MWDC "adopted extensive safety measures such as increasing screening, providing protective equipment, adopting [physical] distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures," MWDC's actions likely did not amount to deliberate indifference. *Id.* at 1090.

Similarly, the Fifth Circuit granted stays of two preliminary injunctions in *Valentine* and *Marlowe*. In *Valentine*, inmates at Texas's Wallace Pack Unit filed a class action suit against the Texas Department of Criminal Justice ("TDCJ") alleging violations of the Eighth Amendment. 956 F.3d at 799. In response to the COVID-19 pandemic, TDCJ had taken preventative measures such as providing "access to soap, tissues, gloves, [and] masks," implementing "regular cleaning," "quarantin[ing] of new prisoners," and ensuring "[physical] distancing during transport." *Id.* at 802. The Fifth Circuit determined that the district court applied the wrong legal standard by "collaps[ing] the objective and subjective components of the Eighth Amendment inquiry" by "treating inadequate measures as dispositive of the Defendants' mental state" under the subjective prong and held that "accounting for the protective measures TDCJ has taken" the plaintiffs had not shown deliberate indifference. *Id.* at 801–03. In *Marlowe*, the Fifth Circuit relied on its reasoning in *Valentine* and again reiterated that there was "little basis for concluding that [the correctional center's] mitigation efforts," which included "providing prisoners with disinfectant spray and two cloth masks[,] . . . limiting the number of prisoners in the infirmary lobby[,] and painting markers on walkways to promote [physical] distancing," were insufficient. 2020 WL 2043425, at *2–3.

Petitioners, and the dissent, urge us to conclude that the BOP was deliberately indifferent to petitioners' health and safety because the BOP's actions have been ineffective at preventing the spread of COVID-19 at Elkton and the BOP "has chosen not to take available action to meaningfully address the risk." CA6 R. 40, Appellee Br., PageID 46–48.[4] Petitioners argue that the BOP "taking measures that it knows will fail is [not] enough to pass constitutional muster." *Id.* at 46–47. Relying on *Richmond v. Huq*, 885 F.3d 928 (6th Cir. 2018), *Darrah v. Krisher*, 865 F.3d 361 (6th Cir. 2017), and *Phillips v. Roane County*, 534 F.3d 531 (6th Cir. 2008), petitioners assert that prison officials "are still deliberately indifferent if they take or persist in a course of action that they know to be ineffective." CA6 R. 40, Appellee Br., PageID 47–48.

---

[4]The dissent contends that the BOP's procedures are inadequate "half-measures" and the supplies provided "reveal[] deep inadequacies." We note, however, that the district court did not hold a hearing prior to granting the preliminary injunction and did not attempt to resolve factual discrepancies in the declarations provided by petitioners and the BOP. For example, the dissent states, "the record reflects that inmates received four ounces of soap per week," but the BOP also explained that "inmates may receive new soap weekly" and additional soap "upon request." DE 10-1, Dees Decl., PageID 183–84.

Additionally, petitioners fault the BOP for failing to make use of the various options for reducing the population at Elkton to enable physical distancing, such as through home confinement or furlough.

First, petitioners' argument that the BOP's response to the COVID-19 virus has been so ineffective as to constitute deliberate indifference fails. The BOP has not shown the same sense of disregard by prison officials as in our cases finding deliberate indifference. *Richmond*, *Darrah*, and *Phillips* are not to the contrary.

In *Richmond*, the plaintiff's claims "center[ed] around the Jail staff's failure to change her dressings as prescribed, to provide her with pain medication as prescribed, and to provide her with psychiatric medication for the first three weeks of her incarceration in spite of their knowledge that she had been taking such medication prior to her incarceration." 885 F.3d at 938. Assessing whether a doctor attending to Richmond was deliberately indifferent to her medical needs, the court concluded that summary judgment was inappropriate because Richmond's medical chart showed that her medical dressing had not been changed six out of sixteen days and she had missed ten dosages of her medication. *Id.* at 939–41. Because reviewing the medical chart would have made the doctor aware of the jail staff's failure to provide care and the doctor took no action to ensure the treatment plan was being followed, the court held that a jury could find the doctor was deliberately indifferent to Richmond's serious medical needs. *Id.* at 940–41. But *Richmond* explained that an official will likely not be found to be deliberately indifferent if they took some action, even if that action was inadequate. *Id.* at 939; *see also id.* ("[W]here medical care is merely inadequate, this Court is 'generally reluctant to second guess medical judgments.'" (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011))). Here, even if the BOP's response has been inadequate, it has not disregarded a known risk or failed to take any steps to address the risk, like the doctor in *Richmond*, such that its response falls below the constitutional minimum set by the Eighth Amendment.

Similarly, petitioners point to the claim in *Darrah* that continued treatment with an ineffective drug constituted deliberate indifference. 865 F.3d at 368. This court concluded that because "the only affirmative action that [the doctor] took was to increase the dosage of [the drug]," the medical treatment was "essentially the equivalent of no treatment at all." *Id.* at

369–70.  The BOP, in contrast, has taken many affirmative actions to not only treat and quarantine the inmates at Elkton who have tested positive, but also to prevent widespread transmission of COVID-19.  These actions have evolved as new guidance has emerged.  The BOP's ongoing and dynamic response to a novel threat can hardly be compared to the doctor's lack of response in the face of no improvement in the inmate's condition in *Darrah*.

Additionally, in *Phillips*, this court found evidence of deliberate indifference when officials disregarded certain prison protocols requiring officials to transport an inmate to a medical center for evaluation.  534 F.3d at 541.  The court concluded that the officials' failure to comply with the protocols and transport the inmate to the medical center, for over two weeks, sufficed to show evidence of deliberate indifference.  *Id.*  In contrast, here the BOP has not turned a blind eye or deaf ear to a known problem that would indicate such a lack of concern for petitioners' welfare.  The BOP has in fact put in place and updated its protocols to address the novel risks from COVID-19.  The BOP's steps to prevent and mitigate COVID-19 spread at Elkton are likely reasonable responses to this serious risk.

Second, petitioners contend that the BOP's response was not a reasonable response to the virus because the BOP had not made full use of the tools available to remove inmates from Elkton, such as temproary release, furlough, or home confinement.  But our precedents do not require that prison officials take every possible step to address a serious risk of harm.  *See Rouster*, 749 F.3d at 448–49; *Jones v. Muskegon County.*, 625 F.3d 935, 944–46 (6th Cir. 2010); *Wilkinson*, 304 F. App'x at 440.  And we must take into account the "constraints facing the official[s]."  *Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (emphasis omitted).  For example, although the BOP has the ability to recommend compassionate release, only the sentencing court is authorized to reduce a term of imprisonment.  18 U.S.C. § 3582(c).  Similarly, the BOP has authority under 18 U.S.C. § 3622 to temporarily release an inmate for a period up to thirty days, but the bases for granting this release are limited to a delineated list of reasons including obtaining medical treatment, visiting a dying relative, or "engaging in any other significant activity consistent with the public interest."  18 U.S.C. § 3622(a).  Finally, as the BOP explains, there are significant risks to inmates and staff when transferring inmates to another facility.  The BOP intentionally stopped inmate facility transfers under Phase Two of its response.  In light of

the BOP's other measures to prevent the spread of COVID-19, and given the limitations on the BOP's authority to release inmates, its failure to make robust use of transfer, home confinement, or furlough to remove inmates in the medically-vulnerable subclass from Elkton does not constitute deliberate indifference.

We conclude that petitioners have not provided sufficient evidence to show that the BOP was deliberately indifferent to the serious risk of harm presented by COVID-19 at Elkton.  This conclusion is dispositive.  "[O]ur cases warn that a court must not issue a preliminary injunction where the movant presents no likelihood of merits success."  *Daunt v. Benson*, 956 F.3d 396, 421–22 (6th Cir. 2020) (quoting *La.-Pac. Corp. v. James Hardie Bldg. Prod., Inc.*, 928 F.3d 514, 517 (6th Cir. 2019)); *see also Cooey v. Strickland*, 604 F.3d 939, 946 (6th Cir. 2010).  The district court erred in holding that petitioners had demonstrated a likelihood of success on their Eighth Amendment claim.

2.

Although petitioners' failure to demonstrate a likelihood of success on the merits is dispositive, we briefly note that the district court's consideration of the other preliminary injunction factors was incomplete.  The district court correctly noted that inmates at Elkton face a risk of irreparable injury if they are infected by COVID-19.  However, the district court gave scant attention to the harms the BOP argued would result from the injunction and ignored the Supreme Court's instruction that the harm to the opposing party and the public interest factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  For example, the BOP argued that release of inmates "'would cause substantial damage to others' because there is no assurance that the inmates can care for themselves upon release."  DE 22, Order, Page ID 368.  The district court dismissed this argument, noting that "[p]etitioners do not ask this Court to throw open the gates to the prison."  *Id.* at 368–69.  That may be true, but the injunction would result in release of some prisoners, and the district court's response does not address the BOP's concerns about how the released inmates would look after themselves.  The district court's response to the BOP's concerns about the impact on the public from release of inmates is similarly insufficient.  The district court rejected the BOP's argument that prisoners might have no safe place to go upon release and return to their criminal activities upon release by

saying that the BOP "might as well be arguing against the release of any inmate[] at any time." *Id.* That response does not address the legitimate concerns about public safety the BOP raised. In granting a preliminary injunction without adequately addressing the remaining preliminary injunction factors, the district court abused its discretion.

## IV.

Because petitioners have not shown a likelihood of success on the merits of their Eighth Amendment claim, the district court abused its discretion in granting the preliminary injunction. We accordingly vacate the district court's April 22, 2020 preliminary injunction.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

COLE, Chief Judge, concurring in part and dissenting in part. COVID-19 is not only highly infectious but also devastating to those unfortunate enough to contract it. It attacks the nose, throat, and lungs of its victims, resulting in effects ranging from flu-like symptoms, to pneumonia, to acute respiratory disease, to death. The likelihood of more severe effects increases dramatically for those who are of an advanced age or who have any number of preexisting conditions, including cardio-vascular disease, respiratory disease, asthma, diabetes, and diseases that compromise the immune system. The inmates whom this preliminary injunction addresses all have characteristics that make them more likely to suffer and die should COVID-19 infect them.

To combat the spread of the virus, the government has recommended that Americans "socially distance" from each other by staying home whenever possible and controlling the nature and extent of their interactions with others to minimize the risk of exposure. But that precaution, which has become routine for so many seeking to guard against infection over the past few months, is unavailable to inmates. Instead, prisoners have been placed in a deadly predicament: prevented by the fact of their confinement from taking recommended precautions, they are left exceptionally exposed to a deadly virus. This reality is particularly concerning for medically vulnerable inmates like those in the subclass.

This predicament has already had deadly consequences at Elkton, which has become an epicenter of the pandemic within the federal prison system. There, groups of roughly 150 inmates continue to be housed together in close quarters. Perhaps predictably, the virus had spread rapidly among inmates and staff alike at the prison by the time the district court issued its preliminary injunction on April 22, 2020. By that time, six inmates at the prison had already died, and more clung to life only with the aid of ventilators, all while the BOP failed to take action to allow the 837 medically vulnerable inmates in its charge at Elkton to follow public health guidelines by maintaining an appropriate distance between themselves and their fellow

inmates.  This failure left these inmates in a perilous situation, which the district court sought to address through the preliminary injunction before us today.  Upon review of the record, I conclude that the district court did not abuse its discretion in granting the preliminary injunction. I therefore respectfully dissent from the majority's opinion finding that it did so.

## I.

For the reasons it thoughtfully explains, I concur with the majority's determination that the district court properly had jurisdiction in this case under 28 U.S.C. § 2241, as the petitioners seek to challenge the fact or extent of their confinement.  *See Adams v. Bradshaw*, 644 F.3d 481, 483 (6th Cir. 2011).  For that reason, I also agree that the PLRA is inapplicable to this case. I disagree, however, with the conclusion that the district court lacked jurisdiction to order the transfer of inmates to another BOP facility, as I read *United States v. Jalili*, to suggest that such relief is available in a § 2241 claim.  *See* 925 F.2d 889, 893–94 (6th Cir. 1991).  Moreover, I do not see our decision in *Martin v. Overton* as being in tension with this conclusion, as that case, unlike this one, involved a conditions-of-confinement claim rather than a fact-of-confinement one.  391 F.3d 710, 714 (6th Cir. 2004).

## II.

Our review of a district order granting a preliminary injunction is "highly deferential." *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011) (internal quotation marks and citation omitted).  We review factual determinations for clear error, legal conclusions de novo, and the overall decision to grant a preliminary injunction for abuse of discretion. *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1116 (6th Cir. 1996).  As the majority notes, the district court considers four factors in determining whether to grant a preliminary injunction:

(1) whether the movant has a strong likelihood of success on the merits;

(2) whether the movant would suffer irreparable injury without the injunction;

(3) whether issuance of the injunction would cause substantial harm to others; and

(4) whether the public interest would be served by the issuance of an injunction.

*E.g.*, *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam).

The majority vacates the preliminary injunction based on its assessment of the petitioners' likelihood of succeeding on the merits of their Eighth Amendment claims. I agree with the majority that the threat of COVID-19 to medically vulnerable inmates in our nation's prisons is an objectively serious one, even more so at a facility like Elkton where prisoners are kept in large groups where they cannot practice social distancing. I disagree, however, with the conclusion that the petitioners are unlikely to succeed in showing that the BOP was deliberately indifferent in responding to that threat.

Our case law is clear: we do not turn a blind eye to prison conditions when the treatment prison officials provide in response to a serious medical need is "so woefully inadequate as to amount to no treatment at all." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (internal quotation marks and citation omitted). Relying on this principle, we found officials to be deliberately indifferent when they persisted in treating an inmate's medical condition with medication that was known to be ineffective instead of an alternative that had proven to be much more effective in addressing the condition. *See Darrah v. Krisher*, 865 F.3d 361, 369 (6th Cir. 2017).

The circumstances here are analogous to those that we considered in *Darrah*. Here, the BOP says that it relied on guidelines from the Centers for Disease Control ("CDC") in crafting its response to the spread of COVID-19 at Elkton. Those guidelines provide that social distancing is "a cornerstone of reducing transmission of respiratory disease." CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* at 4 (Mar. 23, 2020) https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf. Yet, the BOP's multiphase response does not include a single phase that allows for meaningful social distancing. Like the officials in *Darrah*, the BOP persisted with ineffective measures when an effective one was readily available. The fact that the ineffective measures here came in the form of multiple actions instead of a single one does not excuse the BOP's choice to ignore methods that address this "cornerstone" of respiratory-disease management. That failure is more jarring when one

considers that both Congress and Attorney General Barr went out of their way to urge the BOP to take more aggressive measures to address the virus in its facilities.

First, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which allowed the Attorney General to expand the BOP's ability to move prisoners to home confinement. *See* CARES Act, Pub. L. No. 116-136, § 12003(b)(2) (2020). Next, the Attorney General expanded the availability of transfers to home confinement. Then, on April 3, 2020, the Attorney General turned his attention directly to Elkton and other facilities where the COVID-19 outbreak had become particularly severe. He expressly directed the BOP to "immediately maximize appropriate transfers to home confinement of all appropriate inmates" being held at Elkton and the other facilities where COVID-19 was "materially affecting operations." (R. 10-3, PageID 197.)

Nineteen days passed between the Attorney General's directive to the BOP regarding the use of home confinement for Elkton inmates and the district court's order issuing the preliminary injunction that is at issue in this appeal. During that time, the record does not reflect a substantial effort on the part of the BOP to evaluate for home confinement even the 837 medically vulnerable inmates who make up the subclass. That inexplicable delay had dire consequences. By the time the district court issued its order, six Elkton inmates had already succumbed to COVID-19, with others left hospitalized with severe conditions. That number of cases is even more striking when one considers that the most recent BOP figures show that 78 inmates in federal custody have died from the virus to date, meaning that nearly 8% of all inmate deaths over three months occurred at Elkton—a low-security facility that houses less than 2% of all federal inmates—within the first month of the pandemic. BOP, *COVID-19* Cases, https://www.bop.gov/coronavirus/. I am left with the inescapable conclusion that the BOP's failure to make use of its home confinement authority at Elkton, even as it stared down the escalating spread of the virus and a shortage of testing capacity, constitutes sufficient evidence for the district court to have found that petitioners were likely to succeed on their Eighth Amendment claim.

This conclusion is not inconsistent with the decisions of other circuits. In *Swain v. Junior*, 958 F.3d 1081 (11th Cir. 2020), the Eleventh Circuit considered an Eighth Amendment

claim arising out of a state jail and found the efforts that officials at the jail had undertaken were sufficient to preclude a finding of deliberate indifference.  958 F.3d at 1089.  Some of the steps taken by those officials mirror the measures employed by the BOP here, including cancellation of inmate visitation, screening, use of personal protective equipment, and sanitation practices. *Id.* at 1085–86.  There was, however, one crucial difference.  The Eleventh Circuit observed that the officials had implemented social distancing efforts, including changing the position of bunks to maximize social distancing.  *Id.*  This record does not reveal similar efforts at Elkton, where inmates still sleep in close proximity in units of 150 prisoners.

The Fifth Circuit also confronted a similar challenge regarding a state facility in *Valentine v. Collier*, 956 F.3d 797 (5th Cir. 2020).  There, the court did not reach the merits of the deliberate indifference issue, as it found that the district court had misapplied the Eighth Amendment standard altogether.  *Id.* at 802.  The Fifth Circuit seemed particularly troubled that the officials in *Valentine* did not have a basis to conclude that their actions were inadequate.  *Id.* In contrast, the BOP here had a memorandum from the Attorney General highlighting the severity of the outbreak at Elkton and detailing specific steps to address it.  In *Marlowe v. LeBlanc*, the Fifth Circuit also rejected an argument that an increased infection rate alone shows deliberate indifference.  No. 20-30276, 2020 WL 2043425 at *3 (5th Cir. Apr. 27, 2020). But that argument is not the one we consider today, as petitioners rely on far more than the infection rate to make their case.

The BOP casts its overall response to COVID-19 as a "multiphase action plan."  *See* BOP Br. at 4.  That phrase sounds good on paper; it conveys the message that the BOP is doing all that it possibly can to address the outbreak at Elkton.  But it means little until we look behind the curtain and examine whether the plan's phases move the BOP closer to keeping the inmates safe. Such an examination here reveals that the BOP's six-phase plan to address COVID-19 is far less impressive than its title suggests.  That plan consists of two different phases addressing the screening of inmates, an entire phase consisting of only taking inventory of the BOP's cleaning supplies, a phase where the BOP confined inmates to their quarters where they cannot socially distance, and a final phase that just extended the previous one.  (R. 10-1, PageID 174–78.) It turns out, then, that the "six-phase" plan is, for practical purposes, a four-phase plan where one

phase is taking inventory of supplies and another involves the locking of inmates in 150-person clusters where they cannot access the principal method of COVID-19 prevention. Suffice to say, with stakes this high, the specifics matter far more than the headline. As another court observed, "[t]he government's assurances that the BOP's 'extraordinary actions' can protect inmates ring hollow given that these measures have already failed to prevent transmission of the disease." *United States v. Rodriguez*, 2020 WL 1627331 at *8 (E.D. Pa. 2020).

Similar scrutiny of the personal protective equipment and cleaning supplies provided to inmates also reveals deep inadequacies. The BOP says that it provided inmates with soap, personal protective equipment, and disinfectant. At first glance, these certainly seem to be positive steps to prevent the spread of the virus. But the record reflects that inmates received four ounces of soap per week and only two disposable masks, and that the disinfectant provided was "watered down." (R. 1-10, PageID 92; R. 1-11, PageID 95.)

The flaws inherent in the half-measures employed by the BOP are amplified by the BOP's inability to test inmates for COVID-19. At the time of the preliminary injunction, the BOP had only obtained 75 tests for roughly 2,500 inmates at Elkton. (R. 19, PageID 262–63.) The fact that more than two-thirds of those tests came back positive suggests an extremely high infection rate, but the BOP's testing shortage ensured that the record would not reflect the precise figure. (*Id.*) The BOP's failure to test inmates cannot be blamed on a general inability for prison officials to procure tests either. By that same date, Marion Correctional Institution, a comparably sized state facility in Ohio, had tested nearly all of its inmates. (R. 22, PageID 355.)

The measures the BOP took to address the virus, along with those it failed to take, lead me to the conclusion that it did not respond reasonably to the outbreak of COVID-19 at Elkton. As such, the petitioners are likely to succeed on the merits of their Eighth Amendment claim.

III.

I also find that the balance of the other preliminary injunction factors decidedly favors the petitioners.

The petitioners will be irreparably harmed without an injunction. In the fight against the spread of COVID-19, time is plainly of the essence. Each day spent in detention at Elkton increases the threat to the inmates' health and life. Such an ongoing medical risk—particularly in light of the medical vulnerabilities of the subclass—cautions against vacating the preliminary injunction. *Concerned Pastors for Soc. Action v. Khouri*, 844 F.3d 546, 549 (6th Cir. 2016) (per curiam). The district court recognized that this virus is spreading through Elkton so quickly that current testing capacity cannot keep up. The court accordingly directed the BOP to identify vulnerable inmates at Elkton and begin the process of evaluating available arrangements to protect them from the spread of the virus. It is quite possible that, absent a preliminary injunction, the ultimate success of these claims might come too late for vulnerable inmates who could die if forced to remain at Elkton as litigation proceeds.

The BOP argues that it and the public interest are harmed by the preliminary injunction. These arguments fail. The BOP's recitation of the harms that the injunction purportedly causes vaguely refers to unspecified disruptions to its operations required by the devotion of resources to complying with the injunction. But the Supreme Court tells us that "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough" to demonstrate irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)). And even if compliance with the order detracts from other functions, there is no higher and better use of BOP resources than to fulfill its legal and moral obligation to care for the lives of those in its custody. *See Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976).

The BOP's concerns about the challenges caused by affording inmates access to the alternative arrangements contemplated by the preliminary injunction are unsupported by the record. The BOP does not to point to any evidence that releasing inmates who are eligible for home confinement pursuant to the updated guidance provided in the CARES Act and by the Attorney General will somehow be unable to care for themselves or pose a threat to the public interest. Indeed, Congress's decision to update the requirements for home confinement suggests that, if anything, the public interest is served by more eligible prisoners being released to home confinement. Finally, the BOP's claim that the inability to maintain social distancing during

transfer poses a threat lacks support, as the inmates who would be transferred are already being held in a situation where they cannot engage in social distancing.  A transfer process with imperfect social distancing in the short term to achieve a better situation until the pandemic abates or an effective vaccine comes to market is not a greater threat to the public interest than the indefinite confinement of the same prisoners in a facility where they cannot practice social distancing at all.

With the balance of the harms favoring the petitioners, I conclude that the district court did not abuse its discretion in issuing the preliminary injunction.

IV.

All observers of good conscience can agree that the spread of COVID-19 in jails and prisons is an urgent problem.  To address that problem in federal prisons, we rely on the BOP to take measures to protect its inmates, a task that requires consistent, dedicated effort from prison administrators.  To be sure, acting more swiftly and thoroughly may require the BOP to spend additional time and resources to keep its inmates safe.  But when the government "takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989).  For the sake of the 837 medically vulnerable prisoners who depend on the BOP to maintain their health and safety, it is my hope that as the BOP continues its efforts to manage the COVID-19 outbreak at Elkton, it will increase its efforts to live up to that responsibility.

For these reasons, I respectfully dissent.