**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JEREMY VAUGHN PINSON,
*Petitioner-Appellant,*

v.

MICHAEL CARVAJAL, BOP
Director,
*Respondent-Appellee.*

No. 21-55175

D.C. No.
5:20-cv-02599-
PSG-SP

OPINION

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, Chief District Judge, Presiding

BRUCE R. SANDS, Jr.,
*Petitioner-Appellant,*

v.

UNITED STATES OF AMERICA,
*Respondent-Appellee.*

No. 21-55759

D.C. No.
2:21-cv-01114-
JVS-JEM

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted January 19, 2023
Pasadena, California

Filed June 8, 2023

Before:  Ryan D. Nelson, Bridget S. Bade, and Danielle J.
Forrest, Circuit Judges.

Opinion by Judge Bade

## SUMMARY[*]

### Habeas Corpus

The panel affirmed the district court's judgments
dismissing for lack of jurisdiction Jeremy Vaughn Pinson's
and Bruce R. Sands, Jr.'s habeas corpus petitions in which
they asserted that their incarceration during the COVID-19
pandemic violated the Eighth Amendment and sought
release from custody.

The district court dismissed the petitions for lack of
subject matter jurisdiction, concluding that Petitioners were
challenging conditions of confinement, not the fact or
duration of confinement, and thus their claims did not
properly sound in habeas.

The panel was asked to decide whether these sorts of
claims—that    prison    officials    violated    prisoners'

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

constitutional rights by failing to provide adequate conditions of confinement to protect against the spread of COVID-19—may be brought by federal prisoners under the federal habeas corpus statute, 28 U.S.C. § 2241.

Given Pinson's transfer from USP Victorville prior to the court's review of her habeas petition, the panel addressed its jurisdiction. The petition sought relief in the form of release from USP Victorville and an injunction requiring that facility to protect USP Victorville inmates from COVID-19. Because the panel could no longer provide Pinson's requested relief, the panel held that she fails to present a live case or controversy, and Article III therefore prohibits jurisdiction over her petition. Because Pinson was transferred before the district court ruled on her habeas petition, and thus her petition was not "[p]ending review" before the court of appeals, the panel explained that Fed. R. App. P. 23(a) does not apply and does not cure the loss of jurisdiction resulting from Pinson's transfer. The panel likewise held that the district court lacked jurisdiction over Pinson's habeas petition because the district court was unable to fashion the requested relief after her transfer from USP Victorville. The panel accordingly affirmed the judgment dismissing Pinson's petition.

The panel then turned to the main issue on appeal. Sands's habeas petition also challenges his conditions of confinement. Notwithstanding this court's holding in *Crawford v. Bell*, 599 F.2d 890 (9th Cir. 1979) (the "the writ of habeas corpus is limited to attacks upon the legality or duration of confinement" and does not cover claims based on allegations "that the terms and conditions of . . . incarceration constitute cruel and unusual punishment"), Sands argued that his claims that the terms and conditions of

his incarceration constitute cruel and unusual punishment sound in habeas for two reasons.

First, relying on *Hernandez v. Campbell*, 204 F.3d 861 (9th Cir. 2000) (per curiam), Sands asserted that the requested relief is available under 28 U.S.C. § 2241.  The panel wrote that Sands misreads *Hernandez* as instructing federal prisoners to bring claims related to the conditions of their confinement under § 2241.  The panel explained that *Hernandez* did not instruct federal prisoners to bring claims related to the conditions *of their confinement* under § 2241; rather, *Hernandez* states that challenges to "conditions *of a sentence's execution*" may properly be brought under § 2241.

Second, Sands argued that his conditions-of-confinement claims lie at the "core of habeas corpus" because no set of conditions could render his continued confinement constitutional and, thus, release is the only effective remedy.  The panel's review of the history and purpose of habeas led it to conclude the relevant question is whether, based on allegations in the petition, release is *legally required* irrespective of the relief requested.  The panel wrote that by collapsing the habeas analysis into a simple inquiry of the requested relief, Petitioners, and the authority they cite, fail to account for the historic purpose of the writ and misapprehend the relationship between the nature of a claim and its requested relief.  Stated differently, a successful claim sounding in habeas necessarily results in release, but a claim seeking release does not necessarily sound in habeas.  Applying these principles to Sands's petition, the panel concluded that Sands failed to allege facts to support his legal contention that his detention was unlawful because no set of conditions exist that would cure the constitutional violations at FCI Lompoc.  Because

Sands's claims lie outside the historic core of habeas corpus, the panel concluded the district court properly found it lacked jurisdiction to hear Sands's petition.

The panel concluded the district court was not required to convert Pinson's and Sands's habeas petitions into civil rights actions, and declined the invitation to remand to the district court to perform this conversion in the first instance.

## COUNSEL

Gary D. Rowe (argued), Brianna Mircheff, and Andrew B. Talai, Deputy Federal Public Defenders; Cuauhtemoc Ortega, Federal Public Defender of the Central District of California; Public Defender's Office; Los Angeles, California; for Petitioner-Appellant.

Suria M. Bahadue (argued), Assistant United States Attorney; Bram M. Alden, Assistant United States Attorney, Criminal Appeals Section Chief; Tracy L. Wilkison, United States Attorney of the Central District of California; Office of the United States Attorney; Los Angeles, California; for Respondent-Appellee.

**OPINION**

BADE, Circuit Judge:

In these consolidated appeals, federal prisoners Jeremy Pinson and Bruce Sands (collectively "Petitioners") challenge the dismissals of their habeas corpus petitions in which they asserted that their incarceration during the COVID-19 pandemic violated the Eighth Amendment and sought release from custody. The district court dismissed the petitions for lack of subject matter jurisdiction, concluding that Petitioners were challenging conditions of confinement, not the fact or duration of confinement, and thus their claims did not properly sound in habeas.

We are asked to decide whether these sorts of claims—that prison officials violated prisoners' constitutional rights by failing to provide adequate conditions of confinement to protect against the spread of COVID-19—may be brought by federal prisoners under the federal habeas corpus statute, 28 U.S.C. § 2241. Petitioners allege that the district courts are unable to fashion injunctive relief that would render the conditions of confinement constitutional and, accordingly, release is the only available remedy. Consistent with Supreme Court precedent, we reject Petitioners' arguments. We accordingly affirm the district court's judgments dismissing the habeas petitions for lack of jurisdiction.

I.

A.

Jeremy Pinson[1] and Bruce Sands are federal prisoners who were serving sentences in, respectively, the United States Penitentiary in Victorville, California ("USP Victorville"), and the Federal Correctional Institute in Lompoc, California ("FCI Lompoc"), after each pleaded guilty to multiple violations of federal law.  In early 2021, these facilities experienced COVID-19 outbreaks.  While the outbreaks were ongoing, Pinson and Sands filed habeas petitions under 28 U.S.C. § 2241.

In her habeas petition filed on December 14, 2020, Pinson alleged that she was transferred from the United States Penitentiary in Tucson, Arizona ("USP Tucson"), to USP Victorville, where she had been "brutally attacked" in 2008.  Pinson alleges that she was transferred in an effort "to bypass a potential favorable ruling in a federal case challenging . . . COVID-19 protective measures."  There was a COVID-19 outbreak at USP Victorville "[s]hortly after" Pinson's arrival, and Pinson complained that she lacked personal protective equipment and was unable to socially distance.  Because of her "multiple comorbidities," Pinson alleged that her "life [was] in grave danger."  Accordingly, she sought her release or home confinement "as her continued incarceration violate[d] the [Eighth] Amendment."   Pinson also requested injunctive relief ordering the director of the Bureau of Prisons ("BOP") to protect USP Victorville inmates from COVID-19 and an

---

[1] Pinson identifies as a transgender woman, and so we refer to her—as she does herself—using female pronouns.

emergency adjudication of her petition.[2]  The same day that Pinson filed her habeas petition, she was transferred to the United States Penitentiary in Atlanta, Georgia, and then to Coleman, Florida, a few weeks later.[3]

Sands filed his habeas petition on January 29, 2021.  He alleged that prison officials violated his Eighth Amendment rights by: (1) failing to provide adequate care for his hypertension and obesity; (2) failing to implement policies consistent with guidance from the BOP and the Centers for Disease Control and Prevention ("CDC"); (3) failing to "immediately reduce the inmate population" at FCI Lompoc; (4) failing to isolate and retest Sands following an initially inconclusive COVID-19 test result; and (5) failing to remove Sands from housing with inmates who tested positive for COVID-19.  Sands argued that relief was appropriate under § 2241 because he was challenging the fact or duration of his confinement, and "no set of conditions" could remedy the alleged constitutional violations at FCI Lompoc.

## B.

The district court screened and summarily dismissed Pinson's petition, concluding that Pinson's claim did "not contest the legality of her conviction or sentence."  Instead,

---

[2] Pinson also alleged that when she arrived at USP Victorville, an unnamed "SHU Lieutenant" threatened Pinson with physical harm if she were to file suit and "separated her from all of her legal papers."  She does not complain of either act here.

[3] Because it was unclear from the record when Pinson was transferred from USP Victorville, the government moved to supplement the record with a declaration establishing that Pinson was transferred on December 14, 2020.  The motion to supplement the record is GRANTED.  *See Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1020 n.3 (9th Cir. 2010).

the court concluded that Pinson challenged "what she believes are unconstitutional conditions of confinement, which neither the Supreme Court nor the Ninth Circuit have recognized as proper bases for federal habeas relief."

The government moved to dismiss Sands's petition. The magistrate judge recommended granting dismissal because, although "a Section 2241 petition may be utilized by a federal inmate to challenge the manner, location, or conditions of a sentence's execution, it is not the proper vehicle to challenge the conditions of confinement." The magistrate judge concluded that, because Sands sought "release based on the BOP's alleged inability to take certain precautions at FCI Lompoc" against the spread of COVID-19, his "allegations sound[ed] in civil rights, not in habeas."**[4]** The district court adopted the magistrate's report and recommendation and dismissed Sands's petition with prejudice.

## II.

We review a district court's decision to deny a habeas petition and its determination that it lacks jurisdiction over the petition de novo. *Nettles v. Grounds*, 830 F.3d 922, 927 (9th Cir. 2016) (en banc).

## III.

Before turning to the primary jurisdictional question in this case, we must ascertain our jurisdiction over Pinson

---

[4] To the extent Sands's petition was "actually a disguised motion for compassionate release," the court explained relief was improper because such motions must be filed in the sentencing—rather than custodial—court. Sands had previously "filed two separate compassionate release motions [in the sentencing court,] both of which were denied."

given her transfer from USP Victorville prior to this court's review of her habeas petition.

## A.

The United States Constitution limits the "judicial Power" of the federal courts to cases and controversies. U.S. CONST. art. III, § 2, cl. 1. Accordingly, this court is "precluded by Article III . . . from entertaining an appeal if there is no longer a live case or controversy," including where it "can no longer provide . . . the primary relief sought." *Munoz v. Rowland*, 104 F.3d 1096, 1097–98 (9th Cir. 1997). The party seeking relief bears the burden of establishing jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Pinson's petition sought relief in the form of release from USP Victorville and an injunction requiring that facility "to protect USP Victorville inmates from COVID-19." Pinson is no longer detained at USP Victorville. And Pinson has already had petitions dismissed on these same grounds. In *Pinson v. Othon*, she brought an Eighth Amendment conditions-of-confinement claim while she was detained at USP Tucson. No. CV-20-00169-TUC-RM, 2020 WL 7404587, at *1 (D. Ariz. Dec. 17, 2020). While her motion for a preliminary injunction to remedy the alleged violations was pending, she was transferred to USP Victorville, which led the district court to dismiss the action after concluding Pinson's claims had become moot upon her transfer. *Id.* at *2–3 (citing *Munoz*, 104 F.3d at 1097–98). Pinson's claims here are also moot. Because we "can no longer provide" Pinson's requested relief, she fails to present a live case or controversy for our review, and Article III therefore prohibits exercising jurisdiction over her petition. *Munoz*, 104 F.3d at 1097–98.

Pinson argues that we have jurisdiction based on Federal Rule of Appellate Procedure 23(a), which generally prohibits transferring custody over prisoners "[p]ending review of a decision in a habeas corpus proceeding" before the court of appeals.[5] *See* Fed. R. App. P. 23(a). But Pinson was transferred before the district court ruled on her habeas petition, and thus her petition was not "[p]ending review" before the court of appeals. Accordingly, Rule 23(a) does not apply here and does not cure the loss of jurisdiction resulting from Pinson's transfer from USP Victorville.[6] *Cf.*

_____

[5] In her reply brief, Pinson contends her claim is not moot because she may be forced to return to USP Victorville just as she was forced to return to USP Tucson. This contention is speculative on its face and fails to meet Pinson's burden of establishing jurisdiction at this stage in litigation. *See Lujan*, 504 U.S. at 561; *see also Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir. 1991) (concluding claim was moot because there was "neither a 'reasonable expectation' nor 'demonstrated probability' that [appellant] will again return to the State Penitentiary" that he was transferred from). Even if we were to accept her conclusory allegation that she might return to USP Victorville, Pinson points to no evidence that she might return to this facility in the midst of a similar COVID-19 outbreak.

[6] Relying on *United States v. Munsingwear*, 340 U.S. 36 (1950), Pinson contends that even if we determine there is no jurisdiction over her petition, the proper course is not to affirm the district court's order of dismissal, but rather to vacate the judgment below and remand with directions to dismiss. The rule announced in *Munsingwear* is intended to prevent preclusion based on an unreviewed judgment due to "happenstance" or "the unilateral action of the party who prevailed below." *Dilley v. Gunn*, 64 F.3d 1365, 1370 (9th Cir. 1995) (citations omitted); *see also United States v. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 23–25 (1994) (rejecting the contention that automatic vacatur is required whenever mootness prevents appellate review). This rule does not apply to Pinson's case. At most, Pinson is precluded from reasserting her allegations in habeas proceedings (which,

*Darring*, 783 F.2d at 876  (concluding that § 1983 claim for injunctive relief was moot where prisoner was transferred to a different prison before district court ruled on his amended complaint); *Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991) ("Before *our* first decision was rendered in this case, Johnson was transferred to a federal correctional facility in Washington.  Because he has demonstrated no reasonable expectation of returning to [the prior facility], his claims for injunctive relief relating to [that facility's] policies are moot." (emphasis added)).

Pinson also objects that the district court summarily dismissed her habeas petition, without providing notice of its jurisdictional defects or an opportunity to respond.  As Pinson acknowledges, district courts are expected to take "an active role in summarily disposing of facially defective habeas petitions," *Boyd v. Thompson*, 147 F.3d 1124, 1127 (9th Cir. 1998), and if it "plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition and direct the clerk to notify the petitioner,"  R. Governing Section 2254 Cases in the U.S. Dist. Cts., R. 4; *see also id.*, R. 1(b) (permitting district courts to apply the Habeas Rules to § 2241 habeas proceedings).  Pinson does not dispute that her petition alleges claims based on her conditions of confinement; instead, she argues only that the district court's dismissal on this basis was not "obvious" because the Supreme Court has left open the question of whether prisoners can use habeas to challenge confinement conditions.  But the Ninth Circuit has long held that the "the writ of habeas corpus is limited to attacks upon the legality

---

for reasons discussed below, she would be unable to do in any event), but she is not precluded from reasserting them in a civil rights action.

or duration of confinement" and does not cover claims based on allegations "that the terms and conditions of . . . incarceration constitute cruel and unusual punishment." *Crawford v. Bell*, 599 F.2d 890, 891 (9th Cir. 1979).

Pinson's petition cannot be fairly read as attacking "the legality or duration of confinement," and while she sought release from USP Victorville, she also sought an injunction to require USP Victorville to remedy the unconstitutional conditions of confinement. It is also unclear what facts Pinson could allege in an amended petition to confer subject matter jurisdiction on the district court under § 2241. And, of course, the claims in Pinson's petition are now mooted by her transfer from USP Victorville.

For these reasons, we conclude that the district court lacked jurisdiction over Pinson's habeas petition because it was unable to fashion the requested relief after her transfer from USP Victorville, and we accordingly affirm the judgment dismissing Pinson's petition. *Atel Fin. Corp. v. Quaker Coal Co.*, 321 F.3d 924, 926 (9th Cir. 2003) (per curiam) ("We may affirm a district court's judgment on any ground supported by the record, whether or not the decision of the district court relied on the same grounds or reasoning we adopt."). We further conclude that the district court's summary dismissal of Pinson's petition was not improper and deny Pinson any requested relief on that ground.[7]

With these threshold matters resolved, we turn to the main issue on appeal.

---

[7] Because Pinson's petition is moot and does not allege that "no set of conditions" could satisfy constitutional concerns, we do not consider whether she has alleged sufficient facts to support habeas jurisdiction, as we do with Sands's petition in Section III.B.

## B.

Sands's habeas petition also challenges his conditions of confinement. This court's holding in *Crawford* notwithstanding, Sands argues that his claims that the terms and conditions of his incarceration constitute cruel and unusual punishment sound in habeas for two reasons. First, relying on *Hernandez v. Campbell*, 204 F.3d 861, 864 (9th Cir. 2000) (per curiam), he asserts that the requested relief is available under § 2241. Second, he argues that his conditions-of-confinement claims lie at the "core of habeas corpus" because no set of conditions could render his continued confinement constitutional and, thus, release is the only effective remedy. We consider each argument in turn.

## 1.

As an initial matter, we note some tension in our case law regarding the intersection between § 2241 and § 2255. On the one hand, we have routinely held that "§ 2255 provides the exclusive procedural mechanism by which a federal prisoner may test the legality of detention." *Lorentsen v. Hood*, 223 F.3d 950, 953 (9th Cir. 2000); *see also Harrison v. Ollison*, 519 F.3d 952, 955 (9th Cir. 2008); *Ivy v. Pontesso*, 328 F.3d 1057, 1059 (9th Cir. 2003); *United States v. Pirro*, 104 F.3d 297, 299 (9th Cir. 1997). Under this view, § 2241 is an "escape hatch" that allows a federal prisoner to petition for habeas corpus when the prisoner demonstrates that relief under § 2255 would be "inadequate or ineffective to test the legality of his detention." *See Lorentsen*, 223 F.3d at 953; *Harrison*, 519 F.3d at 956; *Ivy*, 328 F.3d at 1059; *Pirro*, 104 F.3d at 299.

This view is supported by § 2255's text, which permits a federal prisoner to move a court to "vacate, set aside, or correct the sentence" based on the contention that the

sentence is "subject to collateral attack," 28 U.S.C. § 2255(a), which is broad enough to cover Sands's claims here. It is also supported by the Supreme Court's conclusion in *Hill v. United States*, that § 2255 "was intended simply to provide in the sentencing court a remedy exactly commensurate with that which had previously been available by habeas corpus in the court of the district where the prisoner was confined." 368 U.S. 424, 427 (1962). And it accords with secondary authority surveying caselaw—including from the Ninth Circuit—concluding that if "relief is possible under § 2255," a remedy under that section is "exclusive" and "traditional habeas corpus [relief] under § 2241 is barred." Charles A. Wright & Arthur R. Miller, 3 FEDERAL PRACTICE AND PROCEDURE— CRIMINAL § 623 (5th ed. 2023).

On the other hand, we have consistently held that "motions to contest the legality of a sentence must be filed under § 2255 in the sentencing court, while petitions that challenge the manner, location, or conditions of a sentence's execution must be brought pursuant to § 2241 in the custodial court." *Hernandez*, 204 F.3d at 864. We first stated this principle in *Ridenour v. United States*, 446 F.2d 57, 57 (9th Cir. 1971) (per curiam), where we summarily affirmed the denial of relief under § 2255 because the petitioner's complaints "concern[ed] the manner of the execution of [the] sentence," and were "not cognizable under § 2255, which is available only to test the sentence imposed, not a sentence as it is being executed." We subsequently applied *Ridenour* to conclude that our jurisdiction under § 2255 does not extend to challenges to parole eligibility because that section permits a prisoner to "test only the sentence imposed and not the sentence 'as it is being executed.'" *Brown v. United States*, 610 F.2d 672, 677 (9th

Cir. 1980) (quoting *Ridenour*, 446 F.2d at 57). Instead, we explained that a habeas petition under § 2241 was "the proper form of proceeding for obtaining review of parole decisions." *Id.*

Four years later, we applied both *Ridenour* and *Brown* to conclude that claims challenging good-time credits were not properly brought under § 2255 because such claims "addresse[d] the execution of [the] sentence, rather than the sentence itself," and a motion under § 2255 could "test only the propriety of the sentence imposed, not the manner of execution." *United States v. Giddings*, 740 F.2d 770, 771–72 (9th Cir. 1984). Instead, we explained that "[r]eview of the execution of a sentence may be had through petition for a writ of habeas corpus under 28 U.S.C. § 2241." *Id.* at 772.

We next applied *Giddings* in a case involving a prisoner's challenge brought under § 2255 to the United States Parole Commission's denial of a parole request based on its reliance on purportedly improper evidence. *Doganiere v. United States*, 914 F.2d 165, 167 (9th Cir. 1990). Again, we affirmed the denial of the motion, explaining that "a section 2255 motion can test only the propriety of the sentence imposed, not the manner of its execution" and that the "proper way to seek review" of a decision by the Parole Commission "is by a petition for a writ of habeas corpus under 28 U.S.C. § 2241." *Id.* at 169–70.

Finally, in *Hernandez*, we considered a habeas challenge to a sentencing determination based on an intervening change in law after the prisoner's initial § 2255 motion had been denied. 204 F.3d at 863–64 (explaining that prisoner sought resentencing based on the intervening decision in *United States v. Felix*, 87 F.3d 1057 (9th Cir. 1996)). We

explained for the first time that "motions to contest the legality of a sentence must be filed under § 2255 in the sentencing court, while petitions that challenge the manner, location, or conditions of a sentence's execution must be brought pursuant to § 2241 in the custodial court." *Id.* at 864.

We further explained, however, that § 2241 relief was *also* available "to contest the legality of a sentence where [the] remedy under § 2255 is inadequate or ineffective to test the legality of [the] detention." *Id.* at 864–65 (internal quotation marks and citations omitted). In other words, *Hernandez* clarified that relief under § 2241 is available in two circumstances: when a petitioner challenges the post-conviction execution of a sentence rather than the legality of the underlying judgment; and when a petitioner challenges a sentence's legality where relief under § 2255 is "inadequate or ineffective to test the legality of [the] detention." *Id.*

Sands does not argue that relief under § 2255 is "inadequate or ineffective to test the legality of" his detention. Instead, he contends that, in *Hernandez*, we instructed "federal prisoners to bring their 'conditions' claims under § 2241" and he reasons that, because his claim pertains "to the execution of [his] federal sentence[] (which includes challenges to unlawful 'conditions'), habeas jurisdiction was proper." This argument is unpersuasive.

First, Sands's argument relies on a misreading of *Hernandez*. Sands reads *Hernandez* as instructing federal prisoners to bring claims related to the conditions of their confinement under § 2241. But we did not instruct federal prisoners to bring claims related to the conditions *of their confinement* under § 2241; rather, we stated that challenges to "conditions *of a sentence's execution*" may properly be

brought under § 2241. *Hernandez*, 204 F.3d at 864 (emphasis added). This is a critical distinction given that *Crawford* explicitly rejected habeas jurisdiction over a federal prisoner's claims related to the conditions of his confinement. *See Crawford*, 599 F.2d at 891–92. In other words, reading *Hernandez* as Sands suggests would make it contradictory to our prior holding in *Crawford*.

In addition to *Hernandez*, Sands relies on our unpublished, non-precedential memorandum disposition in *Moore v. Winn*, 698 F. App'x 485 (9th Cir. 2017), and the "ordinary understanding of the term 'execution.'"**[8]** Of

---

[8] Sands also relies on the Second Circuit's decision in *Jiminian v. Nash*, 245 F.3d 144 (2d Cir. 2001), to argue that conditions-of-confinement claims generally may be brought under habeas because they challenge a sentence's execution. Sands's reliance on *Jiminian* is ultimately unpersuasive. *Jiminian* involved a successive § 2255 motion alleging a sentence was imposed in violation of 18 U.S.C. § 3553(c)(1) because the sentencing court "failed to state, on the record, the reasons for imposing a sentence at the high end of the applicable United States Sentencing Guidelines . . . range." *Id.* at 145–46. The court relied solely on its own precedent to conclude that § 2241 petitions "generally challenge[] the *execution* of a federal prisoner's sentence, including such matters as the administration of parole, computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, types of detention[,] and prison conditions." *Id.* at 146. Unfortunately, this conclusion lacks any rationale that could guide us here, and it does not even appear to be supported by the cited authority, none of which involved consideration of whether a conditions-of-confinement claim may be brought under § 2241. *Compare id.* at 146 (citing *Chambers v. United States*, 106 F.3d 472, 474–75 (2d Cir. 1997) as "articulating instances where a federal prisoner may proper file a § 2241 petition" and stating instances include challenges to "prison conditions"), *with Chambers*, 106 F.3d at 474–75 (explaining § 2241 is the proper vehicle for "[a] challenge to the *execution* of a sentence," including the "calculation of sentence" time and a "decision to deny parole . . . after

course, *Moore* is not binding authority.  And a closer evaluation of *Moore* demonstrates the frailty of Sands's position here.  *Moore* involved a prisoner's challenge to "the federal Bureau of Prison's classification system."  698 F. App'x at 485 n.1.  We concluded that the district court erred in declining to exercise jurisdiction over the prisoner's petition "on the basis that [the prisoner] could not properly challenge the conditions of his confinement through a habeas petition" because, under *Hernandez*, the court could review a petition that contested the manner, location or condition of the sentence's execution.  *Id.* at 486.  Sands misreads this as holding that challenges to the conditions of confinement may be brought in a habeas action.  But given the claim asserted in *Moore*, the better reading is that the district court improperly concluded that the claim challenged the conditions of confinement—which is not cognizable in habeas—when in fact the claim pertained to the location or conditions of the sentence's execution.  *See id.* at 485 n.1.  And even if *Moore* could be read as broadly as Sands suggests, the alleged violations there differ in kind from Sands's allegations, making *Moore* inapposite.

Sands's reliance on the "ordinary understanding" of the execution of a sentence is also unavailing for two reasons.  First, applying the ordinary understanding of the term "execution" merely means § 2241 is available for actions challenging the conditions of carrying out a sentence or

---

imposition by court of sentence," but omitting any reference to prison conditions).  And, as with *Moore*, even if *Jiminian* could be read to suggest that some challenges to prison conditions may be brought under § 2241, the challenges in *Jiminian* are categorically distinguishable from the challenges brought by Pinson and Sands.

putting the sentence into effect. But that is not synonymous with challenging conditions of confinement. Sands cites *Woodall v. Federal Bureau of Prisons*, 432 F.3d 235 (3d Cir. 2005), to define the ordinary understanding of the term "execution." *See id.* at 243. But that case involved a challenge to the location of detention, not the conditions of confinement. *Id.* (explaining that an action under § 2241 would lie where the prisoner challenged that his detention would be carried out in "an ordinary penal institution" rather than a community corrections center). In other words, we can adopt Sands's definition of the "ordinary understanding" of execution and still conclude that Sands's claims are not cognizable under § 2241.

Second, Sands does not identify any published opinion in which we have authorized a conditions-of-confinement claim under § 2241. To the contrary, as discussed, we have consistently applied the terms of § 2255 and § 2241 to limit claims brought under these statutory provisions to challenges to the actual execution of the sentence itself, rather than ancillary harms resulting from the conditions of confinement. *See supra* at 14–17.

We are thus ultimately unpersuaded that the federal habeas statutes or *Hernandez* create an exception to the rule announced in *Crawford* that "the writ of habeas corpus is limited to attacks upon the legality or duration of confinement." *Crawford*, 599 F.2d at 891. We now consider Sands's argument that his claims sound in habeas because, by alleging that there are no constitutionally permissible conditions of confinement and that release is the only adequate remedy, his claims go to the historic core of habeas corpus.

2.

Under *Preiser v. Rodriguez*, 411 U.S. 475 (1973), a prisoner's claim is at "the core of habeas corpus" if it (1) "goes directly to the constitutionality of [the] physical confinement itself" and (2) "seeks either immediate release from that confinement or the shortening of its duration." *Id.* at 489. Because Sands contends habeas is the proper vehicle for his claims in which he seeks release from FCI Lompoc, we address the relationship between these two features of the core of habeas corpus.

The history of the writ of habeas corpus demonstrates that it has always been used to challenge the authority of the sovereign to detain the prisoner.[9] It "was a mechanism for asking *why* the liberty of a subject is restrained." *Edwards*, 141 S. Ct. at 1567 (alterations, internal quotation marks, and citation omitted). In seventeenth-century England, "monarchs sometimes jailed their subjects summarily and indefinitely, with little explanation and even less process. In response, common law courts developed the . . . writ to force the Crown to provide reasons for its actions and, if necessary, to ensure adequate process . . . to justify any further detention." *Id.* (citation omitted); *see also* Richard H. Fallon, Jr., et al., HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 1194 (7th ed. 2015) ("[T]he original office of habeas corpus . . . focused instead on whether extra-judicial detention—most often by the executive—was authorized by law.").

---

[9] At common law there were "several" writs of habeas corpus. *Edwards v. Vannoy*, 141 S. Ct. 1547, 1566 (2021) (Gorsuch, J., concurring). The one referred to here—the so-called "Great Writ"—is technically a writ of *habeas corpus ad subjiciendum*. *Id.* at 1567.

But because this requirement of "process" was often met if the detention resulted from a criminal conviction issued by a court of competent jurisdiction, use of the writ was frequently limited to challenging the jurisdiction of the sentencing court. *See Edwards*, 141 S. Ct. at 1567 (explaining the "exception" to the rule that a final judgment of conviction justified detention was when "the court of conviction lacked jurisdiction over the defendant or his offense" but that "the exception was confined to that limited class of cases" (internal quotation marks and citation omitted)). And it was this limited scope of the writ that was adopted by the first Congress in 1789. *See id.* (explaining that the scope of the statute authorizing issuance of writs of habeas corpus by federal courts was "defined" by the common law); *see also Preiser*, 411 U.S. at 485.

After the Civil War, use of the writ expanded significantly "as a remedy available to effect discharge from *any confinement* contrary to the Constitution or fundamental law, even though imposed pursuant to conviction by a court of competent jurisdiction." *Preiser*, 411 U.S. at 485 (emphasis added). Thus, habeas corpus was "accepted as the specific instrument to obtain release" from unlawful confinement where, for example, the conviction was based on an unconstitutional statute, detention was based on a defective instrument, detention was in the wrong institution, the defendant's constitutional rights were denied at trial, or the revocation of parole and return to detention was unlawful. *See id.* at 486 (collecting cases concluding that these circumstances constitute unlawful confinement and that claims based on these circumstances sound in habeas).

By the time the Supreme Court decided *Preiser*, "habeas corpus relief [was] not limited to immediate release from illegal custody, but [was] available as well to attack future

confinement and obtain future releases." *Id.* at 487. And, of course, the scope and application of habeas corpus relief was fundamentally altered in the 1940s by the passage of §§ 2254 and 2255, which, among other things, "required exhaustion of adequate state remedies as a condition precedent to the invocation of federal judicial relief." *Id.* at 489; *see* 28 U.S.C. § 2254(b)(1)(A); *see also* 28 U.S.C. § 2255(f), (h) (setting one-year statute of limitations on habeas claims brought by federal prisoners and restricting the availability of second or successive petitions). All of which resulted in a situation where, as noted commentators have explained, the "primary contemporary use of federal habeas corpus is as a postconviction remedy for prisoners claiming that an error of federal law—almost always of constitutional law— infected the judicial proceedings that resulted in detention." Fallon, et al., at 1194.

Thus, the history of habeas corpus demonstrates why release from confinement is the only available remedy for claims at the writ's core and, consequently, informs our analysis about how to classify petitions that allege release is the only available remedy. Release is the only available remedy—and thus a claim is at the core of habeas—if a successful petition demonstrates that the *detention itself* is without legal authorization. Authorization may be lacking because—as in seventeenth-century England—the conviction was rendered by a court without the jurisdiction to do so. Or it might be lacking because the prisoner is detained pursuant to a guilty plea that was coerced or offered without the benefit of counsel, potentially "invalidat[ing] the plea and [attendant] sentence." *See Von Moltke v. Gillies*, 332 U.S. 708, 710 (1948). Or it might be lacking because at trial prosecutors failed to disclose exculpatory or impeachment evidence that was material to the petitioner's

guilt.  *See Skinner v. Switzer*, 562 U.S. 521, 536 (2011) (explaining that "*Brady* claims have ranked within the traditional core of habeas corpus").

In all these circumstances, however, the petitioner has demonstrated that custody *was not authorized to begin with*, which is a legal defect that cannot be solved by ordering damages or declaratory relief or an injunction.[10]  Indeed, the Supreme Court has explicitly held that even when a plaintiff seeks money damages—a remedy unavailable to a habeas claimant—the cause of action nonetheless sounds in habeas if "establishing the basis for the damages claim necessarily demonstrates the invalidity of the conviction."  *Heck v. Humphrey*, 512 U.S. 477, 481–82 (1994); *see also Edwards v. Balisok*, 520 U.S. 641, 646–48 (1997) (prisoner's action for damages and declaratory relief properly sounded in habeas because success on the claims would "necessarily imply the invalidity of the punishment imposed").

By contrast, claims that if successful would not necessarily lead to the invalidity of the custody are not at the core of habeas corpus.  Thus, in *Skinner*, the Supreme Court held that a judgment ordering DNA testing did not sound in habeas because nothing about DNA testing itself implicated "the unlawfulness of the State's custody."  562 U.S. at 525 (citation omitted).  Indeed, depending on the results of the DNA testing, the judgment ordering testing could have

---

[10] This principle extends to challenges after a sentence is imposed if a successful challenge would similarly demonstrate that the continuation of the sentence *in any form* is without legal authorization.  *See, e.g.*, *Preiser*, 411 U.S. at 486–87 (explaining that challenge to procedures resulting in deprivation of good-time credits sounds in habeas because "once [petitioners'] conditional-release date had passed, *any* further detention of them in prison was unlawful" (emphasis added)).

proven the *lawfulness* of the state's custody. *See id.*
("Success in the suit gains for the prisoner only access to the
DNA evidence, which may prove exculpatory, inculpatory,
or inconclusive."). Similarly, the Supreme Court has
determined that challenges to state procedures regarding
parole eligibility and suitability do not sound in habeas
because success would mean only a subsequent review of
custody, which could still result in continued confinement.
*Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005).

In short, an action sounds in habeas "no matter the relief
sought (damages or equitable relief), no matter the target of
the prisoner's suit . . . *if* success in that action would
necessarily demonstrate the invalidity of confinement or its
duration."[11]  *Id.*

---

[11] Notably, this relationship between the right violated and the remedy
sought exists in the civil rights context, too. For example, the Supreme
Court has held that individuals who suffered violations of their
constitutional rights by federal officials have the right to monetary
damages not only to recompense them for their harm, but also as a
financial incentive to deter future violations of the kind that gave rise to
damages in the first instance. *See Carlson v. Green*, 446 U.S. 14, 21
(1980) ("[T]he *Bivens* remedy, in addition to compensating victims,
serves a deterrent purpose."); *see also Wilkie v. Robbins*, 551 U.S. 537,
550 (2007) ("[W]e have also held that any freestanding damages remedy
for a claimed constitutional violation has to represent a judgment about
*the best way to implement a constitutional guarantee* . . . ." (emphasis
added)); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70–71 (2001)
(explaining that because the "purpose of *Bivens* is to deter individual
federal officers from committing constitutional violations," a prisoner
may not bring a *Bivens* claim for damages allegedly caused by private
entities); *FDIC v. Meyer*, 510 U.S. 471, 485 (1994) (holding a *Bivens*
claim does not lie against federal agencies because, if damages claims
were permitted against federal agencies, "there would be no reason for

Of course, the Supreme Court has also emphasized the importance of release from custody when considering whether a claim sounds in habeas. *See, e.g.*, *Preiser*, 411 U.S. at 498; *Wolff v. McDonnell*, 418 U.S. 539, 554–55 (1974) (noting that claims that "sought restoration of good-time credits" properly sounded in habeas and that claims that sought damages could be brought in a civil rights action); *Wilkinson*, 544 U.S. at 81–82 (concluding prisoner claims properly sounded in civil rights and not habeas where success on the merits did "not mean immediate release from confinement or a shorter stay in prison"); *id.* at 86 (Scalia, J., concurring) (contending that characterizing a claim contemplating "relief that neither terminates custody, accelerates the future date of release from custody, nor reduces the level of custody" as lying "at the 'core of habeas' would utterly sever the writ from its common-law roots"); *Skinner*, 562 U.S. at 525 ("Habeas is the exclusive remedy . . . for the prisoner who seeks immediate or speedier release from confinement.  Where the prisoner's claim would not necessarily spell speedier release, however, suit may be brought under § 1983." (internal quotation marks and citation omitted)); *see also Nettles*, 830 F.3d at 934–35 (concluding a claim was outside "the core of habeas" because, if successful, the claim "would not necessarily lead to immediate or speedier release").

We do not mean to suggest that the relief requested is immaterial to a claim's characterization: we continue to adhere to the principle that the core of habeas is reserved for claims that seek release from confinement. *See Preiser*, 411 U.S. at 489.  The critical analytical consideration is *why* such

aggrieved parties to bring damages actions against individual officers" and thus "the deterrent effects of the *Bivens* remedy would be lost").

claims are actually at the core of habeas. Thus, the proper analytical tack when determining whether actions like the one brought by Sands are at the core of habeas is to consider *why* release from confinement is necessary to remedy the underlying alleged violation.

It is at this critical step in the analysis that Petitioners and our sister circuits go astray. The question of whether a claim goes to the core of habeas does not turn, as they seem to suggest, solely on whether the prisoner requested release as opposed to some other form of relief. *See Wilson v. Williams*, 961 F.3d 829, 838 (6th Cir. 2020) (noting the "Supreme Court has held that release from confinement— the remedy petitioners seek here—is 'the heart of habeas corpus'" and concluding claims that "sought improvement in the conditions at" a prison "were conditions of confinement claims not appropriately considered under § 2241," but claims that sought release from confinement sounded in habeas (quoting *Preiser*, 411 U.S. at 498)); *Hope v. Warden*, 972 F.3d 310, 323 (3d Cir. 2020) ("Where a petitioner seeks release from detention, habeas (not a § 1983 action seeking release) is proper.").[12]

---

[12] Thus, in *Wilson*, the Sixth Circuit found habeas jurisdiction based on prisoners' allegations that there were "no mitigation efforts that [the prison] could undertake that would prevent the risk of contraction . . . other than immediate release," reasoning that "where a petitioner claims that no set of conditions would be constitutionally sufficient the claim should be construed as challenging the fact or extent, rather than the conditions of confinement." 961 F.3d at 838. In line with this reasoning, the court also concluded that a claim related to non-medically vulnerable inmates was not properly considered in habeas because those inmates only "sought improvement in the conditions at [the prison] rather than release." *Id.* Likewise, in *Hope*, the Third Circuit relied on the

Instead, as previously discussed, our review of the history and purpose of habeas leads us to conclude the relevant question is whether, based on the allegations in the petition, release is *legally required* irrespective of the relief requested. By collapsing the habeas analysis into a simple inquiry of the requested relief, Petitioners, and the authority they cite, fail to account for the historic purpose of the writ and misapprehend the relationship between the nature of a claim and its requested relief.[13] Or, stated differently, a successful claim sounding in habeas necessarily results in release, but a claim seeking release does not necessarily sound in habeas.

3.

We now apply these principles to Sands's petition. Because the government contends jurisdiction is absent over Sands's habeas petition as a matter of law, we are required to take Sands's factual allegations as true, but not his legal conclusions. *See, e.g.*, *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the

---

"extraordinary circumstances" of the COVID-19 pandemic in concluding that a "claim seeking only release on the basis that unconstitutional confinement conditions require it" could be brought in a habeas petition. 972 F.3d at 317. Non-precedential decisions from other circuits have reached similar conclusions. *See Cheek v. Warden of Fed. Med. Ctr.*, 835 F. App'x 737, 738–39 (5th Cir. 2020) (unpublished); *Medina v. Williams*, 823 F. App'x 674, 676 (10th Cir. 2020) (unpublished).

[13] Characterizing causes of action by the relief requested, as the Sixth Circuit did in *Wilson* and as Petitioners advocate here, is in fact contrary to basic precepts of our legal regime: a claim sounds in tort, for example, because it derives from a non-contractual civil injury, not because the plaintiff seeks punitive damages.

framework of a complaint, they must be supported by factual allegations."). In other words, while we must accept as true Sands's allegations regarding the conditions at FCI Lompoc, we must determine whether those facts demonstrate, as Sands contends, that "no set of conditions under the present circumstances" could exist that would constitutionally permit Sands's detention such that the very fact of those conditions violates the Constitution or fundamental law. They do not.

Sands's first basis for habeas relief is that FCI Lompoc's staff was deliberately indifferent in their failure to treat him for his underlying conditions of hypertension and obesity. This alleged violation is at best tangentially related to the COVID-19 pandemic, and Sands fails to explain how relief short of release is inadequate to cure the alleged constitutional violation. Instead, this is a garden-variety Eighth Amendment claim based on the deliberate failure to deliver adequate medical care, which is a standard civil rights claim. *See Malesko*, 534 U.S. at 78 (Stevens, J., dissenting) (explaining that Eighth Amendment claims based on inadequate medical care "fall[] in the heartland of substantive *Bivens* claims"); *see also Estelle v. Gamble*, 429 U.S. 97, 105 (1976) ("Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983."). Because this claim neither goes to the fact of Sands's confinement nor would require immediate release if successful, it is outside the core of habeas.

Sands's second, fourth, and fifth claims allege facts related to the COVID-19 pandemic, but those facts do not demonstrate that his continued detention is unlawful. Sands alleges that staff at FCI Lompoc were deliberately indifferent to his medical needs by failing to implement

policies based on guidelines from the CDC, failing to isolate and retest Sands for COVID-19 after he received an indeterminate test result, and failing to remove him from housing that was allegedly "full of COVID-19-positive inmates" after Sands tested negative.  Sands's allegation that "no set of conditions" could remedy FCI Lompoc's failure to administer a second test after his initial inconclusive test result is facially meritless, as he acknowledges he was retested less than ten days after his initial test.

His allegations related to FCI Lompoc's failure to implement certain policies fare no better.  As an initial matter, Sands does not specify *which* CDC guidelines were deliberately ignored by FCI Lompoc officials, and those guidelines changed frequently and dramatically in the early days of the pandemic.  *See, e.g.*, Deborah Netburn, *A timeline of the CDC's advice on face masks*, L.A. Times (July 27, 2021), https://www.latimes.com/science/story/2021-07-27/timeline-cdc-mask-guidance-during-covid-19-pandemic, [https://perma.cc/DC2N-YMBA] (noting that CDC guidance in early 2020 was that healthy people not taking care of sick individuals need not wear face masks, which changed on April 3, 2020).  More importantly, his allegations demonstrate precisely the set of conditions that would be needed to remedy the alleged constitutional violations: adherence to CDC guidelines regarding, *inter alia*, screening staff, providing sufficient testing, and isolating individuals who test positive for the disease.  The logical inference from Sands's petition is that if FCI Lompoc had followed the protocols and directives from the relevant federal agencies, the unsafe conditions of confinement would be remedied.  These "relevant specific allegations found in the body of the [petition] take precedence" over Sands's bare allegation that there are no set of conditions

under which his confinement would be constitutional. *Smith v. Gross*, 604 F.2d 639, 641 n.2 (9th Cir. 1979). Thus, this claim fails to demonstrate the illegality of his detention or the necessity for release.

Finally, Sands alleges that he suffered an Eighth Amendment violation due to FCI Lompoc's "deliberately indifferent failure to immediately reduce the inmate population." As Sands acknowledges, both Congress and the executive branch directed federal prison authorities to transfer prisoners to promote social distancing during COVID-19 outbreaks. Sands further acknowledges that some inmates were released from FCI Lompoc consistent with this directive, but he contends that the prison "maintained its population above its designated capacity" and received new inmates during that period, which did not allow for "meaningful social distancing between inmates."

A federal prisoner, however, is not without equitable remedies for health issues caused by prison overcrowding. *See Brown v. Plata*, 563 U.S. 493 (2011). In *Brown*, the plaintiffs alleged that the entire California state prison system had "fallen short of minimum constitutional requirements and . . . failed to meet prisoners' basic health needs" for more than a decade. *Id.* at 501. Prisoners with mental health issues were "held for prolonged periods in telephone-booth-sized cages," or in "administrative segregation . . . where they endure[d] harsh and isolated conditions and receive[d] only limited mental health services." *Id.* at 503–04. As a result of this overcrowding, the suicide rate in California prisons was nearly 80% higher than the national average for prisons, and the majority of those suicides were "most probably foreseeable and/or preventable" because they "involved some measure of

inadequate assessment, treatment, or intervention." *Id.* at 504 (internal quotation marks and citation omitted).

Prisoners suffering from physical illnesses fared no better. Prisoners died during delays to see specialists and to receive evaluations from primary physicians; in one case, a prisoner died of testicular cancer after medical professionals failed to develop a treatment regimen despite seventeen months of testicular pain. *Id.* at 504–05. A former medical director for the Illinois state prison system offered evidence that "extreme departures from the standard of care were 'widespread,' and that the proportion of 'possibly preventable or preventable' deaths was 'extremely high.'" *Id.* at 505. By the time the Supreme Court considered the case, conditions in California's prison system had become so dire that prison wardens and health care officials were forced to decide daily which of the medically vulnerable subclasses would be denied care due to staff shortages and patient loads. *Id.* at 509. If any case raises the possibility that the alleged constitutional violations are so widespread no effective equitable relief could be granted, surely it is *Brown*.[14]

And yet, *Brown* was a civil rights action brought under the Prison Litigation Reform Act ("PLRA"). *See id.* at 500. And the Court concluded, based on the allegations, that it was proper for the three-judge district court to determine that the only relief that would remedy the violation of the federal right would be transferring prisoners to "county facilities or

---

[14] In fact, claims alleging systemic constitutional violations within a prison have long been brought through civil rights actions rather than habeas petitions. *See Gates v. Collier*, 501 F.2d 1291, 1295–96 (5th Cir. 1974) (granting relief on a § 1983 claim where it was undisputed that the Mississippi State Penitentiary at Parchman had been characterized by systemic and wide-ranging civil rights abuses for years).

facilities in other [s]tates." *Id.* at 526–27. Thus, Supreme Court precedent amply demonstrates that Sands has access to a remedy that can cure the alleged constitutional violations short of his release.

Importantly, we recognize the grave risks to public health and the tragic mortality rates that attended the COVID-19 pandemic. By no means do we discount those risks or trivialize the suffering experienced by far too many during the pandemic, especially individuals who, like Sands, were lawfully detained during its height. But if injunctive relief can remedy the constitutional violations alleged in *Brown*, it is hard to see how the conditions faced by Sands were so beyond redemption as to require his release.

Moreover, we recognize that the Supreme Court has left open the key question of whether there are circumstances when a challenge to the conditions of confinement is properly brought in a petition for writ of habeas corpus. *See Ziglar v. Abbasi*, 582 U.S. 120, 144–45 (2017) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of confinement.") (quoting *Bell v. Wolfish*, 441 U.S. 520, 526, n.6 (1979)). We conclude that Sands has failed to allege facts to support his legal contention that his detention was unlawful because no set of conditions exist that would cure the constitutional violations at FCI Lompoc.

Because Sands's claims lie outside the historic core of habeas corpus, we conclude the district court properly found it lacked jurisdiction to hear Sands's petition.[15]

## C.

Finally, Petitioners contend that even if we lack jurisdiction over their habeas claims, we should still remand to the district court with instructions to consider their habeas petitions as civil rights actions.  In *Nettles*, we stated that a court may recharacterize a habeas petition if it "is amenable to conversion on its face, meaning that it names the correct defendants and seeks the correct relief" and "so long as [the court] warns the *pro se* litigant of the consequences of the conversion and provides an opportunity for the litigant to withdraw or amend his or her complaint."  830 F.3d at 936 (citation omitted).  But this general principle—that habeas petitions may be converted to civil-rights actions—predates the enactment of the PLRA, which significantly impacted a court's ability to convert a habeas petition into a civil rights action.  *Id.* at 935–36.  And Petitioners point to no case— and we have found none—where such conversion is *required*, rather than discretionary.

Moreover, Petitioners do not even attempt to explain why the respective habeas petitions are amenable to conversion.  Instead, they argue that the district court should have considered "the pros and cons of conversion as required

---

[15] Based on Sands's presentation, we need not—and do not—attempt to circumscribe the reach of habeas relief or relief on a civil rights action for federal prisoners.  *See Nettles*, 830 F.3d at 931.  Sands premised jurisdiction on the reach of § 2241 and on the contention that his "no set of conditions" claim was within the core of habeas corpus.  By rejecting Sands's claims, we do not suggest the proper resolution of other habeas claims for other federal prisoners.

by *Nettles*." But *Nettles* merely states that the district court *may* conduct this exercise, and only where the petition is amenable to conversion on its face, a showing which neither Pinson nor Sands make here. *Id.* at 936 ("*If* the complaint is amenable to conversion on its face . . . the court may recharacterize the petition" after warning and providing for an opportunity to withdraw (emphasis added) (citation omitted)).

And the petitions are facially *not* amenable to conversion. Sands does not seek money damages as allowed by *Bivens* or equitable relief under either the PLRA or federal courts' general authority to issue equitable relief for violation of federal law. Even if Pinson's claims were not moot, she similarly does not seek money damages, and while she seeks equitable relief, she seeks it from the director of the BOP, who is not the proper defendant for claims of violations at an individual prison.

Petitioners' arguments to the contrary are either mistaken or inapposite. They contend, for example, that "*Nettles* makes clear that habeas petitions should not be automatically dismissed because a pro se litigant mistakenly asserts her claims through the wrong procedural vehicle." But that is not the holding in *Nettles,* and it ignores the critical fact that conversion is only potentially appropriate if facially available. Petitioners then argue that the government "wrongly presumes that conversion would have been impossible or otherwise detrimental" because the PLRA's "three-strikes" rule and its exhaustion requirement may not apply. But the mere "possibility" that these limitations might *not* have impacted Pinson's and Sands's petitions does not mean the district court was obligated to convert their petitions to civil rights actions. In fact, the possibility that the limitations *could* have impacted these

petitions indicates that conversion was either not facially available or would not benefit Pinson and Sands. And the argument that "[a]ny other potential mistakes or oversights in the pro se pleadings could have been easily cured through amendment" directly contradicts any implication that the petitions were facially eligible for conversion.

We therefore conclude the district court was not required to convert Pinson's and Sands's habeas petitions into civil rights actions, and we decline the invitation to remand to the district court to perform this conversion in the first instance.

IV.

Accordingly, we affirm the judgments from the district court dismissing Pinson's and Sands's habeas petitions for lack of jurisdiction.

**AFFIRMED.**